## McCLELLAND v. BALTIMORE & O. C. T. R. CO.

### No. 7685.

Circuit Court of Appeals, Seventh Circuit.

Dec. 17, 1941.

Louden L. Bomberger, and Alfred H. Highland, both of Hammond, Ind. (Bomberger, Peters & Morthland, of Hammond, Ind., of counsel), for appellant.

Timothy P. Galvin and Edmond J. Leeney, both of Hammond, Ind., and Roy E. Green and Harry E. Powers, both of Whiting, Ind., for appellee.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

Appellant appeals from a judgment for $11,000 entered against it in a suit by a minor for the loss of his leg which was severed while he was crawling under the coupling between two freight cars in appellant's switching yard. Appellee charged negligence in that appellant "before causing said cars to be moved, carelessly and negligently failed and neglected to give this plaintiff any warning of any kind of his danger, although defendant knew or by reasonable diligence should have known that children were likely to be passing through, under, or over said idle cars; that said defendant negligently and carelessly failed to keep a proper lookout for this plaintiff or other persons similarly located."

The switchyard where the accident occurred was located in Whiting, Indiana, and was about five blocks in length, from Indianapolis Blvd. on the north, to 129th Street on the south, with no intersecting streets between, each terminus being protected by a flagman and gates. The office from which switching operations were controlled was within the yards, just north of 129th Street. One main track crossed 129th Street and led into seven switching tracks about 3,000 feet long. West of the tracks the length of the yard, the land was platted along Schrage Avenue and there were about thirty-seven houses scattered the length of the five blocks on the east side

of the street, most, if not all of which, had fences separating them from appellant's yards. Cross streets, 125th, 126th, 127th and 128th intersected Schrage, but were unimproved beyond the east line of it. The land lying between the yards and Indianapolis Blvd. on the east, known as the "tank farm," was largely open prairie belonging to the Standard Oil Company on which the only construction was four or five large oil tanks surrounded by fire banks. Both the yards and the Standard Oil property were entirely unfenced, except for the fences heretofore mentioned, maintained by the residential property owners along Schrage Avenue.

The yards were busy ones, handling an average of from 900 to 1200 cars a day, with no regularity of hours. Three shifts of men were employed, consisting of five men each, one crew always being on duty. Their duties were to break up trains as they came into the yards at all hours of the day and night, switch the various cars from the lead track onto any of the switch tracks so that they could be handled from there according to their destination. Necessarily cars were often left standing on the switch tracks, and they were often bumped by other cars in process of being moved, and when the various cars to make up a train had not been coupled during the various switching operations it was necessary to send an engine in to close up the string of detached cars. Two of the crew, the engineer and fireman, always remained on the engine, while the other three, the conductor, field man, and pin puller, operated from the ground. All signals between them were by hand or lantern, no audible signals being used. No one rode the cars as they were being sent along the tracks, and their stopping place was determined by the force with which they were shoved by the engine which ordinarily operated from a point south of 129th Street. Although only one engine was used in operations, there were times when there were cars in motion on five of the seven tracks at the same time. Occasionally the tracks might all be empty, and then they might fill up very rapidly.

It is obvious from the record that there was a complete absence of regularity as to operations, and that no one not actually engaged in the switching operations could know when or where cars were going to be moved. It is also obvious that during the course of the operations, all the men engaged therein were very busy. Appellant's

yard clerk testified that if appellant determined to have men ride every cut and provided enough men to ride them all down and look at the track ahead, it would take at least five or six additional men to each crew, and that if an attempt were made to patrol the yards, it would require a large and steady force of men, due to the fact that no one could know in advance just where the cars were going to stop or bump into others, nor was it known from one day to the next how many cars would be handled. He also testified that if the regular crews had to ride the cars it would slow down their operations at least sixty per cent.

We have here, then, the picture of a railroad yard, entirely idle at some times, and extremely busy at others, with no way of telling which condition is going to prevail at any given time.

The accident complained of occurred on March 26, 1937, a school holiday. Appellee was then about eleven and a half years old. He was in the sixth grade in school, making ."fairly good" grades; he had been a member of the school traffic patrol for a year, helping to direct traffic to avoid accidents among school children. On the morning of that day, he, his brother who was two years younger, and a neighbor boy about the same age as the brother, had been playing together, first in the neighbor's home and then in appellee's. They then decided to go over to the tank farm to continue their play. They climbed the fence between their back yard and appellant's yards, and crossed the tracks. At that time there were only a few cars on the last of appellant's tracks.

The boys played for awhile in the snow on the embankment around one of the tanks, then, about eleven o'clock, noticing that the "trains were shooting cars down," they decided to go back before the tracks filled up. The two younger boys went first, and by climbing over some of the cars and going around others, they were able to reach the west side of the yards in safety. There they waited for appellee to catch up with them. By that time there were cars on four of the seven tracks. Appellee crawled under those on two of the tracks and started under those on a third, going under the couplers between two cars. Just as he was emerging, but before he could withdraw his left leg, the car under which he was crawling was bumped by a string of cars, causing it to run over his leg, so nearly severing it that it had to be amputated above the knee. His brother saw the train of about ten tank cars coming and tried to attract his attention by calling to him, but he did not hear. He crawled a short distance after the accident and then was picked up by a neighbor summoned by his brother. He was taken to a hospital where his leg was amputated. He now wears an artificial leg.

There is no suggestion in the evidence that any of the appellant's servants actually knew that appellee or the other boys were anywhere in the vicinity of the moving cars.

■ Appellee introduced considerable evidence tending to show that children and adults alike had always used appellant's yards as a cross-walk. Many witnesses testified that children had used the tank farm as a playground and had also used the north end of the Standard Oil property as a ball field until a commercial structure had been erected on it. All had obtained access to the entire area by crossing appellant's tracks although there were guarded public crossings at each end of the area. Appellee also introduced evidence tending to show that appellant's employees had known of the use of the yards by the public as a cross-walk and had never made any objections. Hence appellee contends that appellant had knowledge of the practice through its employees and had acquiesced in it, and that it thereby incurred a duty to use care in the operation of its trains at the places of such cross-walks. However, all the evidence clearly establishes the fact that while there may have been beaten paths leading off from the stub-end streets, crossing was not confined to such paths, but that on the contrary people generally went across indiscriminately at any point that suited their convenience, going around and over cars according to the condition of the yards at the time. The evidence also establishes the fact that the injury complained of did not occur at one of the alleged crossings. While there is some conflict as to the exact spot where it occurred, the evidence varying as to the distance south of what would have been 127th Street were that street extended across the yards, all witnesses who testified as to this issue agreed that it was south of extended 127th Street, and did not take place on what appellee sought to prove was an established cross-walk.

Appellee concedes that "the general rule * * * (is) that a railroad company owes no duty to a trespasser or mere licensee, other than to refrain from wantonly or intentionally inflicting injury or to exercise ordinary care when it becomes cognizant of the peril of such person." He contends, however, that the facts of this case bring it within the so-called "intermediate" rule as enunciated by the Appellate Court of Indiana in the case of Cleveland C., C. & St. L. R. Co. v. Means, 59 Ind. App. 383, 104 N.E. 785, 793, rehearing denied, 59 Ind.App. 412, 108 N.E. 375. In that case, the Indiana court held the railroad liable for the death of a five-year-old child run over when he was playing under a car on a side track when that car was bumped by another string of cars. We agree with appellant that the facts of that case are so dissimilar to those of the case at bar as to render it without authority as to the facts here involved. There the accident occurred on a single track laid along the south embankment of a canal on the north side of which was situated a public park in a densely populated part of the city of Indianapolis. Because the switch track led to a large flour mill, cars of grain were often unloaded on the track, and for years there had been piles of wheat standing along under the track, and children coming to the park to play had gone on the track to play in the wheat or gather it. The court held that the practice was so established that the railroad knew or should have known of the likelihood of children playing under the cars, hence it should not have moved its cars without some warning.

During the course of the Means opinion, the writer, in commenting on the railroad cases states: "Some of the authorities make the duty to use some care in such cases depend on whether the facts and circumstances of the particular case were such as to indicate to the owner or occupant of the premises that an injury to some member of the public might probably occur in case of his failure to use such care. * * * It does not follow from what we have said that a railroad company is an insurer of the safety of children who come on its premises, either as licensees or trespassers, or that it at all times and at all places owes them the duty of any care. * * * *Reasonable care in such cases does not dispose any duty where the presence of a child on its tracks is merely possible, or where such duty of care imposes on the* *company an unreasonable limitation on the usual and ordinary use of its property.* * * * Hence, in all cases of this kind in the determination of the question of negligence, regard must be had to the character and location of the premises, the purpose for which they are used, the probability of injury therefrom, the precautions necessary to prevent such injury, and the relations such precautions bear to the beneficial use of the premises."

In the later case of Holstine v. Director General of Railroads, 77 Ind.App. 582, 134 N.E. 303, 309, the court repeated the language italicized above, and then stated:

"The law favors the unrestricted use of railroad property and the operation of the trains thereon to the fullest extent consistent with the purpose for which the business of railroads is carried on, namely, the public good. If restricted use of such property would defeat that purpose, such restriction should not be permitted.

* * * * *

" 'The maxim that a man must use his property so as not to incommode his neighbor, only applies to neighbors who do not interfere with it or enter upon it.' "

In the case of Calvert v. New York Central R. Co., 210 Ind. 32, 199 N.E. 239, 241, also decided after the decision of the Means case, supra, the Supreme Court of Indiana stated the rule that, "Where a trespasser or mere licensee is upon the private right of way of a railroad company, the company owes no duty to maintain a lookout or a system of signals to prevent the trespasser or licensee being injured. There was no duty to observe care in order to know whether appellant was in a position of danger or whether he might be injured. Its sole duty was to refrain from wantonly or intentionally inflicting injury, or, having become cognizant that appellant was in a position of peril, to use due care in taking advantage of any chance that it might have to avoid the injury."

Not unnaturally, the facts in both of the cases referred to above differ from those of the case at bar and also from those of the Means case. However, the rule of law is to be clearly traced through all the cases, and as stated in the Means case and quoted in the later case of Dickerson v. Ewin, 105 Ind.App. 694, 17 N.E.2d 496, 498, " '* * * the true and ultimate test of

738

actionable negligence in each case should have been: Did the owner of the premises under the particular circumstances of the case involved owe *any duty* to the party injured on his premises, and if so, was such duty violated and did such violation result in the injury complained of? * * * Whether such a duty existed in this, or in any case, is a question of law for the court, while the question whether such duty was properly performed is a question of fact for the jury.' "

■ We are convinced that under the particular facts of the case at bar, the Indiana authorities do not sustain appellee's charge that appellant owed him a duty to maintain a lookout for him, and to give him warning that it was about to move its cars in such manner as might put him in peril. That being the case, the trial court should have ruled as a matter of law that appellant had violated no duty with respect to appellee, and should have directed a verdict in appellant's favor. We think the record clearly shows that it would impose an unreasonable burden upon appellant to require it to employ sufficient patrolmen or additional crew members to provide adequately against such accidents as occurred here. The difficulty of discharging a duty of warning is well illustrated by the evidence of appellee's brother who was standing approximately opposite the point where appellee was crossing. He actually saw appellee coming, and he also saw the moving cars and realized the danger to appellee and yelled to him in an attempt to warn him but was unable to attract his attention.

Appellee does not suggest how appellant could have furnished any more adequate or effective warning. True, by his questions he implies that perhaps appellant should have rung a bell or blown a whistle. However, apart from the probable ineffectiveness of such warning in a yard where cars are shown to be moving on several tracks at once, and the probable confusion which would result from their use, it would seem unfeasible for other reasons. It must be remembered that the yards lie along a five-block residential section, and the undesirability of sounding bells and whistles every time one of the nine to twelve hundred cars is moved any hour of the day or night seems obvious —at any rate, there was no duty imposed by ordinance to give such warning within the private yards of the railroad.

We have refrained from discussing other issues raised by the parties as to the court's instructions relating to appellant's negligence and appellee's contributory negligence. It is unnecessary for us to determine whether the court should have given a peremptory instruction *as to the contributory negligence of a boy, eleven and a half years old, of at least average intelligence, with a year's experience as a school traffic patrol scout*, who according to the testimony of his father had been repeatedly warned of the danger of crossing the yards and told by him to keep out of them, and not to climb on cars or under them. Such contributory negligence does not become a factor for consideration until the original negligence of the defendant is established, and we are convinced that the court should have held as a matter of law that such negligence had not been established under the facts of the case at bar.

Reversed and remanded.